**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Fred T. Isquith, Esq. (FI 6782)
Gregory M. Nespole, Esq. (GN 6820)
Matthew M. Guiney, Esq. (MG 5858)
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Fax: (212) 545-4653



*Co-Lead Counsel for Lead Plaintiffs and Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ANNMARIE MALLOZZI, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

               Plaintiff,

          v.

INDUSTRIAL ENTERPRISES OF AMERICA, INC.;
JOHN MAZZUTO; JORGE YEPES; DENNIS
O'NEILL; and JAMES MARGULIES,

               Defendants.

-------------------------------------------------------------X

CASE No.: 07-CV-10321 (GBD)

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Lead plaintiffs Carl Meisner, Ronald Goldenberg and Carl Haeussler, and named plaintiff

Shih Yuan Darren Lee, (collectively the "Plaintiffs") individually and on behalf of all other persons

similarly situated, by their undersigned attorneys, allege in this First Amended Class Action

Complaint (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Industrial Enterprises of America, Inc. ("IEAM" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than defendants, who purchased the common stock of IEAM between December 4, 2006 through and including November 7, 2007 (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

2.      Defendants perpetuated an accounting fraud during the Class Period by materially overstating revenue reported in the Company's publicly filed financial statements and other public announcements with the purpose and effect of artificially inflating the market price of IEAM stock.

3.      Defendants' violations of Generally Accepted Accounting Principles ("GAAP") caused the Company to overstate reported revenues for the quarters ended December 31, 2006 ("Q2 2007") by $3.1 million (22.2% overstatement) and March 30, 2007 ("Q3 2007") by $4.9 million

(38.5% overstatement). Moreover, defendants overstated the Company's EBITDA for Q2 2007 by $1.3 million (28.9% overstatement), Q3 2007 by $3.5 million (184% overstatement), and the quarter ended June 30, 2007 ("Q4 2007") by $1.5 million (60% overstatement). For each period, the reported revenue figures met or exceeded the Company's previously issued guidance figures.

4.     Defendants perpetrated their scheme by improperly recognizing revenue for "bill and hold" sales arrangements in a manner that violated both GAAP and the Company's internal revenue recognition policy.

5.     A "bill and hold" arrangement occurs when a seller charges a buyer for products but retains possession of the goods until they are shipped at a later date. Pursuant to GAAP, revenue is generally recognized under these arrangements when goods are shipped to the buyer or to a designated location selected by the buyer, not at the time of billing.

6.     In addition to its improper "bill and hold" accounting practices, IEAM falsely stated to its investors that it recognized revenues *only* when goods were shipped in compliance with GAAP. For example, during a May 22, 2007 investor conference call, defendant Mazzuto stated that IEAM recognizes revenues *only* when goods are actually shipped to purchasers.

7.     The truth about IEAM's actual accounting practices began to emerge on October 15, 2007, when the Company announced it was reviewing the propriety of its previously undisclosed "bill and hold" sales arrangements. This adverse announcement caused the Company's stock to fall approximately 16%, from $3.99 to $3.37 per share, on heavy trading volume.

8.     Additional details emerged on November 7, 2007 after the market closed when the Company announced that its previously issued financial statements and other public statements for both Q2 2007 and Q3 2007 should not be relied upon because the Company had overstated its

3

revenues by $3.1 million (22.2%) and $4.9 million (38.5%) respectively. This announcement caused the Company's stock to fall *almost 64%* (from $2.19 per share to only $0.80 per share) on the first trading day after the announcement and an *additional 15.1%* (from $0.80 per share to $0.68 per share) the following day.

9.    On the same day, the Company announced that its Board of Directors had suspended defendant Yepes, the Company's Chief Financial Officer, pending an internal integrity review with counsel retained by the Board of Directors.

10.    In the wake of these adverse disclosures, nearly all of IEAM's senior officers and directors were either terminated for cause or resigned.

11.    The representations in the Company's press releases and SEC filings issued during the Class Period were materially false and misleading when made because they failed to disclose the following:

(a)    the Company's "bill and hold" practices did not comply with GAAP;

(b)    the Company's "bill and hold" practices did not comply with the Company's own stated policy of revenue recognition;

(c)    the Company overstated its reported revenue for Q2 2007 and Q3 2007 by 22.2% and 38.5% respectively;

(d)    the Company overstated its reported EBITDA for Q2 2007, Q3 2007 and Q4 2007 ranging from 28.9% to 184%; and

(e)    defendants had both the motive and the opportunity to commit the alleged fraud described herein through an undisclosed insider trading scheme resulting in illicit profits of nearly $1.2 million.

4

## JURISDICTION AND VENUE

12.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.   Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

15.   In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.   Court-appointed lead plaintiffs Carl Meisner, Ronald Goldenberg and Carl Haeussler purchased IEAM common stock during the Class Period and have suffered damages as a result. Lead plaintiffs' certifications, previously filed with the Court, are incorporated herein.

17.   Named plaintiff Shih Yuan Darren Lee purchased IEAM common stock during the Class Period as set forth in his certification, filed herewith, and has suffered damages as a result.

18.   Defendant IEAM is a Nevada corporation with its principal executive offices located at 711 Third Avenue, Suite 1505, New York, New York 10017.

19.    IEAM, through its wholly owned operating subsidiaries, is an aftermarket supplier of anti-freeze, motor oil and other chemical products used in automobiles. From the beginning of the Class Period through April 23, 2007, the Company's common stock was listed on the NASDAQ Bulletin Board under the ticker symbol "IEAM.OB." At all relevant times thereafter, the Company's common stock was listed on the NASDAQ Capital Market under the ticker symbol "IEAM" until its delisting on February 15, 2008.

20.    Defendant John Mazzuto ("Mazzuto") served as the Company's Chairman, Director and Chief Executive Officer ("CEO") during the Class Period. Mazzuto also became the Company's interim Chief Financial Officer ("CFO") on November 7, 2007. Only two weeks later, on November 21, 2007, the Company announced that Mazzuto retired as an officer of the Company. Mazzuto remained in his other positions through December 31, 2007 and continued to serve as a member of the Board of Directors. In a contradictory press release issued on February 6, 2008, however, the Company announced that Mazzuto had resigned from those positions on February 5, 2008 "effective immediately."

21.    Defendant Dennis O'Neill ("O'Neill") served as the Company's CFO from March 19, 2007 through May 15, 2007, at which time he relinquished the position due to a reported illness. Although the Company appointed Mazzuto to serve as interim CFO at this time, O'Neill never returned to work for the Company. Prior to becoming CFO, O'Neill served as the Company's Controller.

22.    Defendant Jorge Yepes ("Yepes") served as the Company's CFO from September 4, 2007 through November 6, 2007. Yepes became the Company's full time CFO after O'Neill's illness and Mazzuto's interim service as CFO. According to a press release issued on September 4,

2007, CFO Yepes was "responsible for improving Industrial Enterprises' corporate governance and financial transparency ... he will be in charge of accounting and reporting, strategic planning. ..." On November 7, 2007, however, the Company announced that Yepes had been suspended as CFO in connection with Company policy violations, allegedly unrelated to auditing matters. Thereafter, defendant Mazzuto once again assumed the role of interim CFO. On February 11, 2008, the Company announced that Yepes was terminated from the Company for cause following an internal investigation. Most recently, on June 12, 2008 defendant Yepes was indicted (Indictment No. 08-CRIM-537 (S.D.N.Y.)) on three counts of wire fraud for allegedly attempting to secure a $300,000-a-year finance job by forging documents concerning a regulatory probe into his conduct during his IEAM tenure.

23.    Defendant Robert "Dan" Redmond ("Redmond") has served as the President and Chief Operating Officer ("COO") of the Company since July 20, 2007. Redmond is "responsible for all day-to-day operations and reporting to the chief executive officer." Redmond first joined the Company in April 2007 and was later appointed as the Company's Executive Vice President and President of Pitt Penn Oil Co., LLC, one of the Company's main operating subsidiaries.

24.    Defendant James Margulies ("Margulies") has served as CEO, CFO and Director of IEAM since his re-appointment on February 5, 2008. Since the beginning of the Class Period, Margulies has served as head of the Company's Legal & Compliance Department. Prior to December 4, 2006, Margulies served as the Company's CFO, Vice President and Secretary. Margulies is a named partner of the Cleveland law firm Margulies & Levinson, LLP. Many of the Company's periodic reports filed with the SEC were created using EDGARizer HTML software, licensed to Margulies & Levinson, LLP. (*See* SEC's EDGAR Full-Text Search system).

7

25.    Mazzuto, Yepes, O'Neill, Redmond, and Margulies are collectively referred to hereinafter as the "Individual Defendants."

26.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)    approved or ratified these statements in violation of the federal securities laws.

27.    As officers, directors and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and the NASDAQ Bulletin Board and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

28.    IEAM is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

29.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to IEAM under *respondeat superior* and agency principles.

## GAAP REVENUE RECOGNITION GUIDELINES

30.    During the Class Period, each financial statement issued by the Company explained that IEAM's financial results conformed with GAAP, the uniform rules, conventions and procedures that define accepted accounting practices. As set forth in Statement of Financial Accounting Concepts ("SFAC") No. 1, Objectives of Financial Reporting by Business Enterprises, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance. Specifically:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

SFAC No. 1, ¶ 47.

31.    The SEC requires that public companies prepare and file quarterly and annual financial statements in conformity with GAAP. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles *will be presumed to be misleading or inaccurate.*" 17 C.F.R. § 210.4-01(a)(1). (Emphasis added).

9

32.     Management retains responsibility for preparing financial statements that conform

with GAAP.  The American Institute of Certified Public Accountants ("AICPA") Professional

Standards provide:

> The financial statements are management's responsibility . . .
> Management is responsible for adopting sound accounting policies
> and for establishing and maintaining internal controls that will,
> among other things, record, process, summarize, and report
> transactions (as well as  events and conditions) consistent with
> management's assertions embodied in the financial statements. The
> entity's transactions and the related assets, liabilities, and equity are
> within the direct knowledge and control of management. . . . Thus,
> the fair presentation of financial statements in conformity with
> generally accepted accounting principles is an implicit and integral
> part of management's responsibility.

AIPCA, *Professional Standards*, vol. 1, AU § 110.02 (1998).

33.     Restatements are required for material accounting errors that existed at the time

financial statements were prepared.  *See* Statement of Financial Accounting ("SFAS") 154, ¶ j.  An

error is a term of art and results from, among other things, an error in recognition, measurement, or

mistakes from in the application of GAAP.  SFAS 154, ¶ h.

34.     Under a "bill and hold" arrangement, the seller of goods bills a customer for products

but does not ship the products until a later date.  According to the SEC's Staff Accounting Bulletin

No. 104 ("SAB 104"), revenue may be recognized on a "bill and hold" arrangement only when, *inter

alia*, delivery of the product is made to the purchaser's place of business or another site specified by

the purchaser.

35.     In order to comply with GAAP when delivery has not occurred in a "bill and hold"

arrangement, SAB 104 requires the following before revenue is recognized:

(a)     the risks of ownership must have passed to the buyer;

(b)    the customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

(c)    the buyer, not the seller, must request that the transaction be on a "bill and hold" basis;

(d)    the buyer must have a substantial business purpose for ordering the goods on a "bill and hold" basis;

(e)    there must be a fixed schedule for delivery of the goods;

(f)    the date for delivery must be reasonable and must be consistent with the buyer's business purpose (*e.g.*, storage periods are customary in the industry);

(g)    the seller must not have retained any specific performance obligations such that the earning process is not complete;

(h)    the ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

(i)    the equipment [product] must be complete and ready for shipment.

36.    Under GAAP, revenue should not be recognized until it is realized or realizable, and earned.  SFAC No. 5 ¶¶ 83-84.

37.    According to SAB 104, revenues are generally realized or realizable and earned when all of the following criteria are met:

(a)    persuasive evidence of an arrangement exists;

(b)    delivery has occurred or services have been rendered;

(c)    the seller's price to the buyer is fixed or determinable; and

(d)    collectibility is reasonably assured.

11

38.    The Company's public statements represented that the Company complied with internal revenue recognition policies and the mandates of SAB 104. Specifically:

(a)    the Company's Form 10KSB/A filed with the SEC on December 28, 2007, stated: "Revenues are recognized as earned. *Sales are recorded when products are shipped to customers.*" (Emphasis added);

(b)    the Company's Form 10KSB filed with the SEC on November 14, 2006, stated: "Revenues are recognized as earned. *Sales are recorded when products are shipped to customers.*" (Emphasis added); and

(c)    the Company's quarterly reports filed on Forms 10QSB on February 16 and May 22, 2007, failed to properly disclose the Company's revenue recognition policy on "bill and hold" arrangements because these reports stated that revenues are recognized upon delivery of products to the customer or through sales to the distribution channel, without any mention of "bill and hold" arrangements or the Company's revenue recognition policy.

## SUBSTANTIVE FACTUAL ALLEGATIONS OF FRAUD

**A.    Defendants Engaged in a Series of Accounting Improprieties Designed to Inflate the Company's Financial Results in Violation of GAAP and the Company's Own Revenue Recognition Policy**

39.    The Company failed to satisfy the criteria established under SAB 104 and, consequently, improperly recognized revenues on "bill and hold" arrangements in violation of GAAP and in violation of its own stated practices. Specifically, on November 7, 2007, the Company revealed that "after reviewing its bill and hold transactions for fiscal 2007, that the Company did not properly follow GAAP revenue recognition." Thus, IEAM's "bill and hold" sales were improperly recognized as revenue.

12

40.    On the same day, the Company stated that it cancelled the revenue it recognized on certain "bill and hold" transactions because the buyers were unable to take delivery of the Company's products. Instead, the Company issued 2.4 million shares of the Company's restricted stock to these purchasers to settle any claims they may have against the monies paid to the Company. The November 7, 2007 announcement stated in relevant part as follows:

> All bill and hold purchases were paid in full, and cash was received prior to June 30, 2007, but because the buyers were unable to take delivery of their merchandise, the Company was forced to cancel these transactions and will reflect an approximate $8 million in liabilities on its books at the year ended June 30, 2007. The buyers of the bulk purchases have agreed to settle their potential claims for these cancelled sales for 2.4 million shares of restricted stock and the above purchase and delivery of product. This settlement will remove the liability during the second quarter ended December 31, 2007. Additionally, Industrial Enterprises has the option to repurchase these shares at current market prices.

The Company never disclosed the reasons behind the failure of the buyers to take delivery of the merchandise. However, SAB 104 provides in relevant part, "if uncertainty exists about customer acceptance, *revenue should not be recognized until acceptance occurs*." (Emphasis added).

41.    In stark contrast to both SAB 104 requirements and the Company's stated policy, the Company's November 7, 2007 announcement revealed that the risks and rewards of ownership *did not* pass from the Company to the purchasers, because the purchasers effectively had a right of return or contingency that allowed the purchasers to demand their purchase monies back if they elected not to accept the Company's goods.

42.    Consequently, the Company failed to accurately disclose its revenue recognition policy on the "bill and hold" arrangements in its periodic filings with the SEC. Instead, the

13

Company stated that its policy was to recognize revenues when earned and when products are shipped to customers.

43.    GAAP required the Company to disclose its revenue recognition policy on "bill and hold" arrangements. Accounting Principles Board Opinion No. 22 required the Company to disclose its revenue recognition policy in this regard in the Company's GAAP prepared financial statements, yet no such disclosures were made by the Company in violation of GAAP.

44.    SAB 104 also required disclosure of the Company's revenue recognition policy on "bill and hold" arrangements. SAB 104 states in relevant part:

> Because revenue recognition generally involves some level of judgment, the staff believes that a registrant should always disclose its revenue recognition policy. If a company has different policies for different types of revenue transactions . . . the policy for each material type of transaction should be disclosed.

45.    The Company selectively disclosed in its Form 10QSB filed with the SEC on May 22, 2007, that it engaged in "bulk sales" of its products, but failed to disclose that some or all of the "bulk sales" were made with "bill and hold" arrangements or the fact the there were "bill and hold" arrangement for non "bulk sales." Rather than inform investors of the truth, during a May 22, 2007 conference call, defendant Mazzuto falsely reassured investors about the Company's policy as follows:

> <Q - Bob Rank>: Good morning, John. Couple of questions, Stuart actually asked some of them, but in the 10-Q you talked a little bit about revenue recognition policies, and on page 16 of the Q in the first paragraph, you make a statement that I don't understand and may be you could clarify. The company has a revenue recognition policy, which it follows in recognizing such sales, and that refers to bulk sales. What is the revenue recognition policy?
>
> <A - John Mazzuto>: It has to be -- a lot of bulk sales people actually buy it in place on the floor et cetera, and it is both you move

it when they want it, I don't like that policy. *We recognize sales when it's gone to a wholesaler and they moved it off our premises and it is in their warehouse.*

(Emphasis added).

**B.    The Company Issued Materially False and Misleading Statements Concerning its Business During the Class Period**

46.    The defendants knew or recklessly disregarded numerous facts known to them before and during the Class Period concerning, *inter alia*, that the Company's "bill and hold" practices did not comply with GAAP, that the Company's "bill and hold" practices did not comply with the Company's own stated policy of revenue recognition, and that the Company overstated its reported revenue for Q2 2007 and Q3 2007.  Notwithstanding the foregoing, the defendants made the following materially false and misleading statements of material fact:

### i.    False and Misleading December 2006 Announcements

47.    The Class Period begins on December 4, 2006 when the Company issued an intentionally false and misleading press release concerning the Company's anticipated Q2 2007 results.  The press release noted that Q2 2007 revenues were anticipated to be significantly higher as a result of increased production.  The press release stated in relevant part as follows:

> John Mazzuto, Chief Executive Officer of Industrial Enterprises of America, commented, "Our first quarter results, as previously announced, are in line with guidance provided by the Company. During this, our second quarter, *we anticipate a significant increase in revenues as we continue to increase our production capacity with similar gross margins*...."

(Emphasis added).

48.    The next day, the Company reported expected revenues of $16 million for Q2 2007 in a Form 8-K filed with the SEC as follows:

On Tuesday, December 5, 2006 at 9:00 a.m. Eastern Time, Industrial Enterprises of America, Inc. (the "Company") held a public conference call to discuss the results of its first quarter. During the call, John D. Mazzuto, the Company's Chief Executive Officer and interim Chief Financial Officer, disclosed material information that may not have been publicly disclosed in the past.

Mr. Mazzuto projected that the Company could anticipate revenues of $16 million for the second fiscal quarter of 2007, $20 million for the third quarter and over $50 million potentially for the fourth quarter. Additionally, Mr. Mazzuto projected earnings per share of approximately $0.22, $0.33 and $0.50, respectively, for the second, third and fourth quarters of fiscal 2007, before any charges related to derivative securities.

49.     The Company subsequently reported that it exceeded its projected $16 million in revenues for Q2 2007, reporting revenues of almost $17 million on February 16, 2007.

50.     The statements of anticipated revenues for Q2 2007 detailed in the December 4, 2006 press release, and Form 8-K were intentionally false and misleading when made because, as set forth in ¶¶ 30-41 above, the Company has admitted that at the time:

(a)     it improperly recognized revenues on products that were not shipped to its customers under "bill and hold" arrangements in violation GAAP for Q2 2007; and

(b)     that recognition of such revenues violated the Company's own revenue recognition policy.

51.     Moreover, the intentionally false nature of the revenue projections are evidenced by defendant Mazzuto's false and misleading statement on May 22, 2007 that "[w]e recognize sales when it's gone to a wholesaler and they moved it off our premises and it is in their warehouse." This statement directly contradicted the Company's actual "bill and hold" practices, demonstrating that

Mazzuto intentionally misled investors concerning the legitimacy of the revenue projected and subsequently recognized by the Company.

      ii.      **False and Misleading February 2007 Announcements**

      52.      On February 16, 2007 the Company issued a materially false and misleading press release for the quarter ended December 31, 2006. The press release and corresponding Form 8-K reported revenues of $17 million for Q2 2007. The announcement also reported EBITDA of $5.8 million for the six months ended December 31, 2007.

      53.      The revenue and earnings reported by the Company for Q2 2007 exceeded the Company's revenue target and the reported EBITDA was within range of the Company's estimates. On February 16, 2007, defendant Mazzuto stated, in relevant part: "We exceeded our revenue target while EBITDA came within an acceptable range. . . ." Defendant Mazzuto also noted the following: "By focusing on non-seasonal items and limiting our winter inventory, our production, up 70% from just three months ago, allowed us to grow dramatically."

      54.      In conjunction with the Company's February 16, 2007 press release, the Company filed its financial statements for Q2 2007 on Form 10QSB with the SEC. This 10QSB reported substantially similar revenue amounts as the February 16, 2007 press release. The Form 10QSB was signed by defendant Mazzuto as the Company's CEO and CFO, and also certified by him pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial information contained in the 10QSB.

      55.      The February 16, 2007 press release and 10QSB were materially false and misleading at the time the statements were issued as evidenced by the Company's November 7, 2007 announcement which revealed that the Company:

(a)    improperly recognized revenues on products that were not shipped to its customers under "bill and hold" arrangements in violation GAAP for Q2 2007;

(b)    that recognition of such revenues violated the Company's own revenue recognition policy; and

(c)    consequently, the Company's reported revenues for Q2 2007 of approximately $17 million and EBIDTA for Q2 2007 of $5.8 million were overstated by $3.1 million or 22.2% and $1.2 million or 28.9% respectively.

56.    As a result of the Company's February 16, 2007 announcement, between February 13, 2007 and March 30, 2007, IEAM stock increased from $4.85 per share to $6.59 per share.

### iii.    False and Misleading May 2007 Announcements

57.    On May 22, 2007 the Company issued a press release reporting revenues of approximately $17.6 million for Q3 2007 and EBITDA of $6.8 million for the nine months ended March 31, 2007.

58.    EBITDA results purportedly met the Company's previously announced target, in relevant part, as follows:

> "*We are very pleased with our overall financial results*, with EBITDA on target prior to the inventory accounting correction. Revenues were lower than previously guided due to mild weather during the quarter, and a higher than expected number of contract packaging contracts which recognize only processing fees," commented John Mazzuto, Chief Executive Officer of Industrial Enterprises of America. "During the fiscal third quarter, the company increased unit through-put by approximately 30% through improved operating efficiencies and additional manufacturing shifts. *Our order flow continues to outpace shipments*, and we will continue to leverage our production capacity and look at opportunistic acquisitions that can improve our asset utilization."

(Emphasis added).

59.     In conjunction with the Company's May 22, 2007 press release, the Company filed its financial statements for Q3 2007 on Form 10QSB with the SEC. The 10QSB reported substantially similar results and was signed and certified pursuant to SOX by defendant Mazzuto as the Company's CEO and CFO.

60.     Finally, as more fully described above, on the same day, the Company held an investor conference during which defendant Mazzuto assured investors that the Company's revenue recognition practices complied with GAAP, in pertinent part, as follows: "We recognize sales when it's gone to a wholesaler and they moved it off our premises and it is in their warehouse."

61.     The May 22, 2007 press release, 10QSB and conference call statements were materially false and misleading as evidenced by the Company's subsequent announcement on November 7, 2007 which reveals that the Company:

(a)     improperly recognized revenues on products that were not shipped to its customers under "bill and hold" arrangements in violation GAAP for Q3 2007;

(b)     that recognition of such revenues violated the Company's own revenue recognition policy; and

(c)     consequently, the Company's initially reported revenues for Q3 2007 of approximately $17.6 million and Q3 2007 EBITDA of $6.8 million were overstated by $3.1 million or 22.2% and $3.5 million or 184% respectively.

**iv.     False and Misleading July 2007 Announcements**

62.     On July 12, 2007, the Company issued a press release announcing its fourth quarter and annual financial results for the quarter and year ended June 30, 2007. The announcement stated

that the Company's EBITDA for Q4 2007, which had already ended, would be $4 million and would

meet the Company's prior guidance. The announcement stated in relevant part as follows:

> For the fiscal fourth quarter ended June 30, 2007, financial
> performance is expected to be on par with previously guided earnings
> estimates of $4.0 million, although such performance is always
> subject to auditor adjustments. However, revenues are expected to
> come in lower than anticipated due to a change in product mix, as
> previously discussed on the Company's third quarter conference call.
> Additionally, the Company's accounts receivable balance, which had
> risen sharply in the previous two quarters due to bulk sales, has been
> subsequently reduced by those amounts as receivables on the bulk
> sales have been collected. Actual financial results are expected to be
> reported sometime in late September.

63.    On July 20, 2007, the Company issued a press release clarifying certain statements in

its July 12, 2007 press release. The July 20, 2007 press release stated in relevant part:

> The $4 million in anticipated earnings forecasted for the fourth
> quarter (up from $3.7 million last quarter) as referenced in the press
> release was calculated based on EBITDA. EBITDA (earnings before
> interest, taxes, depreciation and amortization) is a financial measure
> which it believes is a useful performance indicator.
>
> EBITDA is not a recognized term under generally accepted
> accounting principles, or "GAAP," and should not be considered as
> an alternative to net income/(loss) or net cash provided by operating
> activities, which are GAAP measures. A reconciliation of EBITDA
> to net income/(loss) will be provided in the year-end earnings release,
> as will both actual results for the fiscal fourth quarter and full year
> period.

64.    EBITDA reported for Q4 2007 in the July 12, 2007 announcement and later clarified

and reiterated in the July 20, 2007 announcement was materially false and misleading as evidenced

by the Company's November 7, 2007 announcement stating that EBITDA for Q4 2007 would be

reduced by $1.5 million due to the exclusion of revenues from improper "bill and hold"

arrangements.

65.    The Company's announcements on July 12 and July 20, 2007 were intentionally false and misleading when made because, in order to achieve a $4 million EBITDA for Q4 2007, the Company had to include revenues from improper "bill and hold" arrangements. As set forth above, recognition of such revenues violated GAAP, the Company's own revenue recognition policy, and defendant Mazzuto's May 22, 2007 proclamation that "[w]e recognize sales when it's gone to a wholesaler and they moved it off our premises and it is in their warehouse."

66.    After repeatedly assuring its investors about the propriety of the Company's revenue recognition policy and practices, on October 15, 2007, after market close, the Company issued a press release announcing a review of its accounting practices. For the first time, the Company disclosed that it was engaging in "bill and hold" arrangements. As a result of the review, the Company stated that it was unable to timely file its annual report for fiscal year ended June 30, 2007. The announcement stated in relevant part:

> Industrial Enterprises of America, Inc. today announced that management is currently conducting a review of its accounting practices including a review of its revenue recognition policy regarding "bill and hold" transactions.
>
> Industrial Enterprises' management is currently working to determine the most appropriate revenue recognition method to replace its prior "bill and hold" practice. A "bill and hold" transaction occurs when a company records a sale and gives ownership of the product to the customer, but actual delivery takes place in a later period. While a change in its revenue recognition policy would only affect the timing of recognition of certain revenue, management has determined that its previous policy needs further review. The company will provide updated information once it has completed an in-depth analysis of the most appropriate revenue recognition method.
>
> Additionally, during the year-end review, management has determined that one of its supplier's [sic] is a variable interest entity (VIE). A VIE is an entity in which a company has a controlling financial interest. In this specific case, while neither the company nor

21

any of its employees has any financial interest in the vendor, management has determined that because the company is this vendor's sole customer, under GAAP accounting, they are considered a VIE. The Company is reviewing the most appropriate treatment of this VIE, which may include the audit of the financials of the VIE and the consolidation of the financial statements of the VIE into the financial statements of the company.

\*    \*    \*    \*

Based on the above issues, the company will not be filing its delayed Annual Report on Form 10-KSB for the year ended June 30, 2007 until these matters have been resolved. The company will continue to update on the progress of the filing.

67.    The October 15, 2007 adverse announcement, issued after market close, caused the Company's stock to fall nearly $.62 per share (15.5%) to $3.37 per share the following day.  Over one million shares were traded the day after the announcement, more than 33 times the prior day's trading volume.

68.    The October 15, 2007 announcement, however, falsely reassured investors that management was working to improve the Company's financial reporting and transparency, in relevant part, as follows:

Dan Redmond, President and Chief Operating Officer, commented, "New Chief Financial Officer, Jorge Yepes and I are committed to improving the financial reporting and transparency of the company. Since my arrival in April of this year, Industrial Enterprises has made numerous strides improving manufacturing efficiencies and operational controls. We are dedicated to restoring our financial transparency in the marketplace. I am confident the company has the right people in place to deliver consistent growth and measurable results."

69.    In the same announcement defendant Yepes stated:

While we are disappointed that we will not be able to meet our filing extension, we are working diligently to ensure that our financial reports include improved financial disclosures and transparency.

22

70.    The October 15, 2007 statement by defendant Yepes was materially false and misleading because defendant Yepes was not diligently working to timely file the Company's overdue annual report with the SEC, nor working to improve the Company's financial disclosures and transparency.  Less than a month later, on November 7, 2007, the Company issued a press release, entitled "Industrial Enterprises of America Suspends Chief Financial Officer," announcing the suspension of defendant Yepes as the Company's CFO due to potential violations of the Company's policies and procedures.  The press release also announced the commencement of a review associated with the suspension.  On February 11, 2008, the Company terminated defendant Yepes for "cause."

71.    On October 19, 2007, the Company announced that it had received a Staff Determination Notice from NASDAQ because of IEAM's failure to timely file its annual report for the fiscal year ended June 30, 2007.  The announcement explained the purported rationale for the delay in filing the annual report as follows:

> The reason for the delay in filing the Form 10-KSB is the additional time required for Industrial Enterprises to review the company's revenue recognition policy and account for a supplier that has been deemed a Variable Interest Entity.  Management is currently reviewing these changes with its Audit Committee and its independent auditors.  Until the Audit Committee's review is complete, Industrial Enterprises will be unable to complete and file its Annual Report on Form 10-KSB for the year ended June 30, 2007. The company intends to file its Annual Report on Form 10-KSB as soon as practicable after the completion of the review.

72.    The October 19, 2007 announcement caused the Company's stock to fall 5% ($.19) from the previous closing price on the first trading day after the announcement.

C.    **The Truth is Revealed**

73.    On November 7, 2007, the Company issued a press release entitled "Industrial

Enterprises Provides Accounting Update" which provided additional information concerning the

Company's "bill and hold" arrangements.  The press release informed investors, for the first time,

that the Company's previous financial statements should not be relied upon and that the previously

reported results would require a restatement.  The announcement stated in relevant part:

> During the year-end annual audit, it has come to the Company's
> attention that a supplier to the Company may be required to be
> accounted for as a Variable Interest Entity (VIE) due to the fact that
> the Company is its sole customer. Based upon further evaluation by
> both the Company and its auditors, the VIE does not appear to be
> material to the overall operations of the Company and consequently
> does not appear to require an audit or to be consolidated into the
> Company's financials. The Company's previous auditors are now
> reviewing this relationship during the fiscal 2006 time period and are
> evaluating whether the VIE needs to be consolidated into the
> Company's fiscal 2006 financials. Company management believe that
> the auditors will concur with the 2007 accounting treatment of the
> VIE, but no conclusion has yet been made. Management cautions that
> the filing of the 2007 Form 10KSB is contingent upon the Company
> filing the restated 2006 annual report.
>
> *            *            *            *
>
> *Additionally, the Company has determined, after reviewing its bill*
> *and hold transactions for fiscal 2007, that the Company did not*
> *properly follow GAAP revenue recognition procedures. Therefore,*
> *the bill and hold transactions for the quarter ended December 31,*
> *2006 in the amount of approximately $3.1 million will be cancelled,*
> *and the bill and hold sales for the quarter ended March 31, 2007 in*
> *the amount of $4.9 million will also be cancelled. Such bill and*
> *hold sales represented $1.3 million of EBITDA in the quarter ended*
> *December 31, 2006 and $3.5 million of EBITDA in the quarter*
> *ended March 31, 2007. Also, the bill and hold transactions that*
> *were to take place in the 4th quarter have been cancelled. These*
> *sales would have accounted for EBITDA in excess of $1.5 million.*
> *Based on the cancellation of the fourth quarter bill and hold sales,*
> *the EBITDA guidance for the quarter is no longer applicable.* Of
> the total cancelled bill and hold revenue, $1.6 million will be
> reflected in the first quarter of 2008 representing $1.1 million in

EBITDA and $1.2 million in revenue will be recorded in the second quarter of 2008 representing EBITDA of approximately $400,000. The margins on these sales were unusual because the Company was able to sell finished goods inventory that the Company had purchased at distress prices. It is expected that the Company's customers will continue to execute bulk transactions in the future; however, the margins from the previous bill and hold transactions are not sustainable.

All bill and hold purchases were paid in full, and cash was received prior to June 30, 2007, *but because the buyers were unable to take delivery of their merchandise, the Company was forced to cancel these transactions and will reflect an approximate $8 million in liabilities on its books at the year ended June 30, 2007*. The buyers of the bulk purchases have agreed to settle their potential claims for these cancelled sales for 2.4 million shares of restricted stock and the above purchase and delivery of product. This settlement will remove the liability during the second quarter ended December 31, 2007.

(Emphasis added).

74.    This disclosure, coupled with the disclosure of defendant Yepes' suspension as described above, caused the Company's stock to decline an astonishing *63.5%* – $1.39 per share on over 2.9 million shares traded – more than 20 times the previous day's volume.  Company stock declined an additional 15.1% or $.12 per share on November 9, 2007 on heavy volume.

## ADDITIONAL ALLEGATIONS DEMOSNTRATING FALSITY AND SCIENTER

75.    The magnitude of IEAM's accounting errors relative to its overall operations – requiring the drastic step of an accounting restatement – demonstrates a cogent and compelling inference of scienter.

76.    IEAM's admission that its previously issued financial statements during the Class Period: (i) did not comply with GAAP; (ii) required a restatement; and (iii) violated the Company's

own revenue recognition policy demonstrates that IEAM's financial statements were false and misleading when issued.

77.     The Company overstated revenues by no less than 22% and as much as 38% during the Class Period.  Likewise, the Company overstated its EBITDA by as much as 184% during the Class Period.  Such large percentages that favor the Company and that met the Company's prior guidance demonstrate scienter.

78.     Numerous, additional questions raised about the propriety of the Company's disclosures also demonstrate scienter:

(a)     On February 5, 2008 the Company disclosed, for the first time, a material related party transaction in the amount of $4 million in connection with a non-bank "credit line" the Company had incurred.  The Company's February 5, 2008 press release stated in relevant part:

> Additionally, Mr. Mazzuto will be assuming over $4 million of unsecured debt. The payment of this debt had been guaranteed by Mr. Mazzuto and secured by personal assets and common stock controlled by Mr. Mazzuto at the time it was incurred in July 2007 as part of a non bank "credit line." The nature of these loans and guarantees had not previously been disclosed in public filings. The assumption of this debt is without recourse to the Company by Mr. Mazzuto or the lenders. As a result of this transaction, the company expects to incur an extraordinary, non-recurring, non-cash gain of over $4 million.

(b)     Pursuant to Item 404 of Regulation S-K, the Company was obligated to disclose this related party transaction as it clearly exceeded the $120,000 threshold.  The failure to disclose this related party transaction was a violation of Regulation S-K and GAAP, and is probative of the Individual Defendants' scienter.

(c)      Defendant Mazzuto previously filed a Chapter 7 bankruptcy petition on November 11, 2002 in the U.S. Bankruptcy Court for the Southern District of New York (C.A. No. 02-15586 (RDD) (the "Bankruptcy").

(d)      On November 27, 2004 the Bankruptcy trustee filed a complaint against Mazzuto for, among other things, knowingly and fraudulently withholding documents relating to Mazzuto's property and financial affairs.

(e)      Neither the Bankruptcy nor the trustee's complaint were ever disclosed in the Company's reports filed with the SEC as required by the federal securities laws. The information was material to an evaluation of Mazzuto's ability to serve as CEO and his ability to adequately carry out his fiduciary duties.

(f)      On November 14, 2006, the Company amended and restated its financial statements for the year ended June 30, 2006 in order to correct an error concerning restricted cash in an attorney's escrow account that had been expended to satisfy a debt. Moreover, the Company had also restated its annual report for the fiscal year ended June 30, 2005 to correct the accounting treatment for an asset purchase agreement entered into by the Company in May 2004. The Company also had to restate the same annual report and the quarterly periods ended September 30, 2004, December 31, 2004, March 31, 2005, September 30, 2005, December 31, 2005 and March 31, 2006 in connection with the removal of $1.9 million in disputed liabilities from its books. This documented history of the Company's disregard for the mandates of GAAP further supports a cogent and compelling inference of scienter.

(g)      The termination or resignation of IEAM's management and directors during the period leading up to and following the announced restatement also demonstrates scienter:

(1)    On May 15, 2007 defendant O'Neill left his post as CFO of the Company due to a reported illness;

(2)    On November 21, 2007 the Company announced that defendant Mazzuto was to retire from the Company due to health reasons (like O'Neill before him) effective December 31, 2007. In fact, the announced reason for Mazzuto's departure from the Company was untrue and an attempt to hide the real reason for his departure. On February 5, 2008 the Company announced defendant Mazzuto had "resigned" effective immediately from the Company. Upon information and belief, defendant Mazzuto was forced to "retire" or "resign" because of the accounting scandal. For example, while many CEOs and officers retire from a Company with a severance package, Mazzuto was forced to return 500,000 shares of previously issued Company stock according to a February 5, 2008 Company announcement.

(h)    After the November 7, 2007 announcement concerning the suspension of defendant Yepes, on February 11, 2008 the Company announced that it had terminated Yepes for cause. Upon information and belief, defendant Yepes' termination resulted from his acquiescence to the continued improper revenue recognition scheme alleged herein after he joined the Company in September 2007. The February 11, 2008 announcement stated in relevant part:

> Thomas J. Curran, a former securities prosecutor in the Manhattan District Attorney's Office and current Partner of Ganfer & Shore, LLP, acted as independent counsel. As noted in the November 7, 2007 press release, the purpose of the review was to investigate possible violations of the Company's policies and procedures.
>
> The review of Mr. Yepes [sic] conduct has been completed by the independent outside counsel to the Audit Committee. After consideration of that report, Mr. Yepes was given notice of his termination on February 11, 2008. As part of that notice IEAM has reserved any and all legal recourse against Mr. Yepes.

(i)      On the same day, Company director and audit committee member Michael J. Solomon inexplicably resigned.

(j)      The existence of an SEC investigation of IEAM and criminal proceedings against defendant Yepes:

(1)      On June 12, 2008, defendant Yepes was indicted (Indictment No. 08-CRIM-537 (S.D.N.Y.)) by a grand jury for three counts of wire fraud in connection with the following allegations: Yepes forged SEC communications to an employment recruitment agency in furtherance of his attempt to obtain a $300,000 per-year job;

(2)      The indictment reveals that defendant Yepes created false email communications between him and an SEC attorney, and that defendant Yepes altered a letter he received from the SEC in connection with its investigation of IEAM; and

(3)      According to the indictment, defendant Yepes falsified these documents in an effort to pass the employment agency's background search and to obtain the $300,000 per-year CFO position at an unnamed company. These communications were falsified to imply that defendant Yepes has cooperated with SEC's investigation of IEAM and that defendant Yepes had provided valuable information to the SEC.

79.      According to the Company's February 19, 2008 press release, the Company is in the process of investigating the propriety of the continuing increase in the number of outstanding shares of the Company's stock beginning before, and continued throughout, the Class Period. According to the announcement, the increase in the Company's share count was a "surprise" to the Company's Board.

80.    Defendant Mazzuto also had motive and opportunity to misstate the Company's earnings and revenue statements. Defendant Mazzuto was involved in undisclosed insider trading of the Company's stock through a third party intermediary from at least late 2006 through the Class Period that resulted in at least $1,145,000 worth of illicit proceeds.

81.    Confidential Witness No. 1 ("CW1") is a former business associate of an individual named Peter Vanucci. The two participated in several investment companies located in the same office in Cleveland, Ohio, including an entity named River Valley Asset Management, LLC ("River Valley"). CW1 was neither a control person of River Valley nor did he have check writing authority for River Valley. River Valley was owned and controlled by Mr. Vanucci. All of the following allegations under this section are derived from CW1's personal knowledge.

82.    Through a fraudulent "consulting agreement" between IEAM and River Valley, on or after March 14, 2006, IEAM issued River Valley 400,000 shares of IEAM common stock in payment for $100,000 worth of consulting services that were never performed. The shares of IEAM stock were deposited in a Scottrade account registered to River Valley controlled by Mr. Vanucci.

83.    Beginning in at least December 2006 and continuing through at least March 2007, under the direction of defendant Mazzuto, Mr. Vanucci sold IEAM stock based upon non-public information provided by Mazzuto in order to maximize proceeds from each sale. Initially, the improper transactions were made by Mr. Vanucci under the direction of defendant Mazzuto. Later, Mr. Vanucci provided the account login information for the Scottrade account to defendant Mazzuto, thus allowing Mazzuto to make transactions independently. The IEAM stock that was sold during this undisclosed stock trading scheme included both the 400,000 shares obtained in exchange for the

30

fraudulent consulting agreement and the additional shares defendant Mazzuto transferred to the Scottrade account.

84.    The arrangement enabled Mr. Vanucci and defendant Mazzuto to trade IEAM stock on inside information and to sell IEAM stock defendant Mazzuto had no authority to own or sell in his own right.  Upon information and belief, at least $1.145 million in proceeds from these stock sales was wired from the Scottrade account to a Wachovia bank account registered to "Industrial Enterprises" from December 2006 through March of 2007.  The transfers from the Scottrade account to IEAM's Wachovia bank occurred as follows:

- $200,000 on December 22, 2006;

- $100,000 on January 8, 2007;

- $60,000 on January 12, 2007

- $200,000 on January 22, 2007;

- $75,000 on January 24, 2007;

- $275,000 on February 2, 2007;

- $35,000 on February 20, 2007;

- $100,000 on February 23, 2007;

- $75,000 on February 26, 2007; and

- $25,000 on March 26, 2007.

85.    As part of his role in the scheme, Vanucci was paid a percentage of the proceeds from the stock sales, believed to be approximately 10%, while the remaining profits were funneled back to bank accounts owned or controlled by defendant Mazzuto or IEAM.

86.    CW1 obtained knowledge of the stock trading scheme after witnessing Mr. Vanucci's review of the Scottrade account statements to calculate his portion of profits on a weekly basis. CW1 also overheard telephone calls between Mr. Vanucci and defendant Mazzuto concerning the insider trading scheme.

87.    At least $206,000 in proceeds from these stock sales was wired from the Scottrade account to a Wachovia bank account registered to "Parrish Pond" from March 2007 through May 2007.

88.    Parrish Pond is a limited liability company created by defendant Mazzuto, now believed to be controlled by his children. Parrish Pond's primary asset is a home located at 32 Parrish Pond Lane, Southampton, New York, which was purchased by Parrish Pond at the direction of defendant Mazzuto in October of 2006 for approximately $3.1 million.

89.    On March 21, 2007, $109,658.38 in proceeds from these stock sales was wired from the Scottrade account to a Bank America account belonging to an Audi/Porsche dealership in Florida to purchase a Porsche for defendant Mazzuto's girlfriend.

## **NO SAFE HARBOR**

90.    The statutory safe harbor provided for certain forward-looking statements does not apply to any of the false statements alleged in this Complaint. None of the statements alleged herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

91.    In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Individual Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of IEAM who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made. None of the historic or present tense statements made by the Individual Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION/ECONOMIC LOSS

92.    During the Class Period, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated IEAM's stock price and operated as a fraud or deceit on purchasers of IEAM stock by misrepresenting the Company's financial condition and business prospects. Once the Individual Defendants' misrepresentations and fraudulent conduct were disclosed to the market, IEAM's stock price reacted negatively as the artificial inflation was removed from it. As a result of their purchases of IEAM stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

93.    The Individual Defendants' false and misleading statements had the intended effect and caused IEAM stock to trade at artificially inflated levels throughout the Class Period.

94.    As investors and the market became aware of IEAM's prior misstatements and omissions and that IEAM's actual financial condition and business prospects were, in fact, not as represented, IEAM's stock price reacted negatively, damaging investors.

### Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine

95.    At all relevant times, the market for IEAM's common stock was an efficient market for the following reasons, among others:

(a)    IEAM's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Capital Market and Bulletin Board, both highly efficient and automated markets;

(b)    During the class period, on average 887,254 shares of IEAM stock were traded on a weekly basis. During the Class Period approximately 13,297,754 shares were outstanding. Approximately 6.6% of the all outstanding shares were traded on a weekly basis, demonstrating a very strong presumption of an efficient market;

(c)    As a regulated issuer, IEAM filed with the SEC periodic public reports during the Class Period;

(d)    IEAM regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)      IEAM was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace;

(f)      Numerous NASD member firms were active market-makers in IEAM stock at all times during the Class Period;  and

(g)      Unexpected material news about IEAM was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

96.      As a result of the foregoing, the market for IEAM's common stock promptly digested current information regarding IEAM from all publicly available sources and reflected such information in IEAM's stock price.  Under these circumstances, all purchasers of IEAM's common stock during the Class Period suffered similar injury through their purchase of IEAM's common stock at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

97.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased common stock of IEAM during the Class Period and who were damaged thereby.   Excluded from the Class are defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98.      The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, IEAM's securities were actively traded on the

NASDAQ and OTCBB markets. According to a Company quarterly report filed on Form 10-QSB with the SEC on May 22, 2007, as of May 18, 2007 the Company had 13,297,754 shares outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by IEAM or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

99.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

100.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

101.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether IEAM violated GAAP and/or its own revenue recognition policy in improperly recognizing revenues as alleged herein;

(c)    whether the misstatements alleged herein were made with scienter;

(d)    whether statements made by the Individual Defendants to the investing public during the Class Period misrepresented material facts about the business, prospects, sales, operations and management of IEAM; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of
### The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against Defendants IEAM, Mazzuto, O'Neill, and Yepes

103.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

104.    This First Claim is asserted against defendants IEAM, Mazzuto, O'Neil, and Yepes (collectively the "First Claim Defendants").

105.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell IEAM's securities at artificially inflated and distorted

prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

106.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of IEAM as specified herein.

107.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IEAM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about IEAM and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of IEAM's securities during the Class Period.

108.    Each of the First Claim Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the First Claim Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the First Claim Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the First Claim Defendants enjoyed significant personal contact and familiarity with the other defendants and

38

was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the First Claim Defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the First Claim Defendants culpably participated in the wrongful conduct alleged herein.

109.    The First Claim Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IEAM's financial condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

110.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for IEAM's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of IEAM's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which

the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired and/or sold IEAM securities during the Class Period at artificially high prices and were damaged thereby.

111.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding IEAM's financial results, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired IEAM securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

112.    By virtue of the foregoing, the First Claim Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

113.    As a direct and proximate result of the First Claim Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

114.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

<div align="center">

### SECOND CLAIM

**Violation Of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

</div>

115.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

116.    This Second Claim is asserted against each of the Individual Defendants.

117.    The Individual Defendants acted as controlling persons of IEAM within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

118.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

119.    As set forth above, IEAM and the certain Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

120.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

121.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 2, 2008                      Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         Laurence Rosen, Esq. (LR 5733)
                                         Phillip Kim, Esq.  (PK 9384)

                                         -and-

                                         **WOLF HALDENSTEIN ADLER**
                                       **FREEMAN & HERZ LLP**
                                       Fred T. Isquith, Esq. (FI 6782)
                                       Gregory M. Nespole, Esq. (GN 6820)
                                       Matthew M. Guiney, Esq. (MG 5858)

                                         ***Co-Lead Counsel for Lead Plaintiffs and Class***

43

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Industrial Enterprises of American, Inc. ("IEAM"), and certain of its officers and directors. The Rosen Law Firm, P.A. agrees to prosecute the action on a contingent fee basis not to exceed one-third of any recovery and will advance all costs and expenses. Any legal fees and expenses will be determined by, and payable, only upon order of the U.S. District Court.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the complaint against IEAM and certain of its officers and directors and authorized the filing thereof by the Rosen Law Firm, P.A., whom I retain as counsel in this action for all purposes.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in IEAM securities during the class period set forth in the complaint.  I have made no transactions during the class period in the debt or equity securities that are the subject of this lawsuit except those set forth below.

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| 2000 | 12/11/06 | $4.15 | 1/3/07 (1512 shares) | $ 4.10 |
| 1080 | 4/23/07 | $6.02 | | $ |
| 2500 | 4/23/07 | $6.02 | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

| | | $ | | $ |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |

5.     I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.     I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _29_ day of _November_, 2007.

Signature: _____

Name:    Shih Yuan Darren Lee

Address:

Phone:

E-mail:

Item. 4 (continue from prior page if needed)

| Number of Shares Purchased or Sold | Date(s) Purchased | Price Paid Per Share | Date(s) Sold (if applicable) | Price Sold Per Share |
|---|---|---|---|---|
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |
| | | $ | | $ |

PLEASE FAX CERTIFICATION TO ROSEN LAW FIRM at (212) 202-3827
OR MAIL TO:
THE ROSEN LAW FIRM PA
350 FIFTH AVENUE, SUITE 5508
NEW YORK, NY  10118

2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies and declares as follows:

I am over the age of 18 and not a party to this action. My business address is 350 Fifth Avenue, Suite 5508, New York, New York, 10118, which is in the county where the mailing described below took place.

On July 2, 2008, I served the within FIRST AMENDED CLASS ACTION COMPLAINT, by U.S. mail on the parties identified in the attached service list. I placed a true and correct copy thereof in a sealed envelope addressed as set forth on the attached service list and caused such envelope, with first class postage thereupon fully prepaid, to be placed in the U.S. Mail at New York, New York, and certify that such envelope was placed for collection and mailing following ordinary business practices.

I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed: July 2, 2008, in New York, New York.

Nathan Huddell

44

## SERVICE LIST

Tiffany A. Buxton (NY)
John F. Cambria (NY)
Theodore J. Sawicki (GA)
Robert R. Long (GA)
ALSTON & BIRD, LLP
90 Park Avenue
New York, NY 10016

*Attorneys for defendants Industrial Enterprises
of America, James Margulies, and Dennis
O'Neill*

William Francis Dahill
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110

*Attorneys for defendant Jorge Yepes*

Fredric S. Newman
Sheryl B. Galler
HOGUET NEWMAN
REGAL & KENNY, LLP
10 East 40th Street
New York, New York 10016

*Attorneys for defendant John Mazzuto*

45